IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| HN DOE and JANE DOE, parents and next ends of their Minor Child JAMES DOE, | |
| PLAINTIFFS | Civil Case No. __1:23-cv-00580__ |
| vs. | |
| | DATE: March 3, 2023 |
| BOULDER VALLEY SCHOOL DISTRICT, WHITTIER INTERNATIONAL ELEMENTARY SCHOOL, and ROB ANDERSON, KATHY GEBHARDT, LISA SWEENEY-MIRAN, NICOLE RAJPAL, STACEY ZIS, BETH NIZNIK, KITTY SARGENT, RICHARD GARCIA, AND SARAH OSWICK, in their official capacity as state actors for the State of Colorado, | |
| DEFENDANTS. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs John and Jane Doe submit this Memorandum of Law in support of their Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") under Fed. R. Civ. P. 65(a) and (b) and D. Colo. L.R. 7.1. They also submit the Affidavits of Jane Doe, Ann Grandits, and Attorney Kellie Miller in support of this motion, with exhibits filed under seal.

Until recently, Plaintiffs' nine-year-old son, James Doe, was a fourth-grader at Whittier International Elementary School ("Whittier Elementary") in the Boulder Valley School District ("BVSD"). In January 2023, Sally Roe — a fourth-grade classmate and friend of James Doe — accused James of racism after he proposed a game at recess in which he asked Sally and another Black classmate to play "servants" and "bodyguards." James used no racial slurs; he simply suggested a playground role playing game.

1

Whittier Elementary officials, acting under color of state law, found nine-year-old James responsible for "harassment or bullying on the basis of race" and imposed severe disciplinary consequences on him, including social isolation at recess and a change of classrooms. Whittier Elementary officials made this finding without providing the Does with any of the due process required by BVSD policy. At the same time, James Doe's accuser Sally Roe was not found responsible for bullying — or, indeed, disciplined in any way — for an incident just days earlier in which she physically assaulted James by choking him to the point he needed to see the nurse.

Meanwhile, Sally Roe's mother Jamillah Richmond, an employee of Whittier Elementary, targeted James and his family on her public Facebook account. She referred to the Doe family as "white liberal racists" and falsely accused James — a nine-year-old child with whom she interacted regularly as an employee of Whittier Elementary — of making "numerous racist and ableist comments to Black children." Ms. Richmond's public posts garnered numerous responses, including threats of violence and others referring to the Doe family as "white trash" and to James as an "evil child." Ms. Richmond also announced she would call the parents of students in James's new class to "warn" them about James.

Despite repeated pleas from the Doe family, BVSD has refused to take any remedial measures to protect James Doe either from racially discriminatory discipline or from the racially hostile environment at Whittier Elementary created by its own employee Jamillah Richmond. As a result, James Doe has been unable to attend Whittier Elementary for over a month. James cannot attend Whittier so long as Defendants continue to refuse to address the hostile environment, and his ability to attend another school is compromised both by the erroneous finding of racial harassment on his disciplinary record and by Defendants' refusal to give the Doe family a copy of the educational records he needs to enroll in another school.

The merits of the Does' case overwhelmingly favor a TRO and PI. Defendants imposed racially discriminatory discipline on James Doe and have turned a blind eye to a racially hostile environment created by its own employees. As a result of Defendants' actions, James was constructively expelled and was out of school for more than a month. He has just now begun temporarily attending a new, private institution pending the provision of his educational records, which Whittier Elementary withholds.  Even at his new school, he may be kicked out once the institution receives his disciplinary record from Whittier Elementary branding him a racist. As a result of Defendants' actions, James Doe continues to suffer irreparable harm, with an incalculable impact on his social, emotional, and intellectual development.

## I.   BACKGROUND

### A.  James Doe's interactions with Sally Roe.

James Doe and Sally Roe were fourth-grade classmates and friends at Whittier International Elementary School. Affidavit of Ann Grandits ¶ 4.  James is white, and Sally is Black. As is known to all Defendants, Sally struggles with impulse control. She frequently hits, kicks, and even strangles other students.  A. Grandits Aff., ¶ 5.  It is undisputed that on January 17, 2023, Sally strangled James Doe, putting him in a choke hold with her arm around his neck. Affidavit of Jane Roe, Ex. P.  Whittier has a protocol in place for dealing with Sally's violent outbursts wherein she is sent to the school office, where she writes a reflection paper on the incident. A. Grandits Aff., ¶ 8. This was the protocol followed on January 17 when Sally strangled James. *Id.*

Three days later, on January 20, 2023, James, Sally, and another Black fourth-grade classmate were playing together at recess. James asked them to play "servants and bodyguards." J. Roe Aff., Ex. N.  He used no racial slurs; he simply suggested a playground role-playing game.

3

*Id.*  When interrogating James Doe in the discipline process, James said the idea to role play on the playground came from their class's current study of servants in Colorado history, which has never been a slave state and in which, historically, most servants were white.  J. Roe Aff., Ex. N. This did not matter to BVSD or his Principal.  They were determined to make an example of James by "becoming more aware of our own biases" in the name of what BVSD calls "equity" (rather than equality). Attorney Miller Aff., Ex. K.

Unfortunately for James, Sally Roe has a history of accusing children she has assaulted of racism in an effort to re-direct her mother's anger away from her — a history of which Whittier Elementary employees are well aware. A. Grandits Aff., ¶ 10. Sally's mother, Jamillah Richmond, works at Whittier Elementary and is well-known as an activist around racial issues in the Boulder Valley School District. Attorney Miller Aff., Ex. B; Ex. C; Ex. D.

**B. Defendants' response to Sally Roe's racism allegation.**

While Sally Roe faced no disciplinary action for strangling James Doe, Defendant Sarah Oswick — Whittier Elementary's principal — swung into action after Sally's allegation that James's playground game suggestion was racist. Defendant Oswick not only initiated an "investigation" into racial harassment and bullying against James Doe, she escalated the matter by permitting Sally Roe and Ms. Richmond to add previously unheard-of false and unrelated allegations to the "Bullying Investigation and Outcome Report."  J. Roe Aff., Ex. N.  These allegations included that months prior, James had supposedly made comments about Sally Roe's natural hair looking "like rats were coming out of it" and that James was "bragging about being rich" because he had helped to pay for his own pair of Air Jordan shoes. *Id.*

In reality, and as any reasonable investigation of these allegations would have revealed, it was Sally Roe who told James that ***his*** long and untamed hair looked like "a rats nest" — and

James, on one occasion, had responded in kind.  J. Roe Aff., ¶6. In reality, as any investigation would have revealed, it was Sally Roe who had apologized to James for her comments about him and his Air Jordans.  J. Roe Aff., Ex. O.  Further, any reasonable investigation would have also shown that Sally Roe had physically assaulted James on at least three separate occasions, including strangling him, which once required a trip to the school nurse. J. Roe Aff., Ex. O; J. Roe Aff., ¶ 5; A. Grandits Aff., ¶6.

But Defendants did not care about reality. Instead, they were beholden to their activist employee Jamillah Richmond, an outspoken social justice activist who co-founded the Parents of Color Council, a group purporting to advise BVSD on issues of so-called "anti-racism" and the discipline practices of BVSD schools.  Attorney Miller Aff., Ex. B; Ex. K.  So Defendant Oswick pushed forward with her sham investigation.  Defendant Oswick never interviewed Andee Grandits, the teacher for both James Doe and Sally Roe, who could have testified to the students' relationship and patterns of behavior. A. Grandits Aff., ¶15. Defendant Oswick did not inform the Doe family about the increasingly wild and false allegations that Sally Roe was making.  J. Roe Aff., ¶ 9, 10, 11.  These were allegations that could easily have been disproven. For example, Sally Roe claimed that James Doe had threatened her in the school office on January 25, 2023 — but Andee Grandits was an eyewitness to the entire interaction between the two students in the office, and confirmed that no threat was made. A. Grandits Aff., ¶ 20-23. Yet on nothing more than the say-so of a nine-year-old girl with a documented history of false reports to school administrators and violent attacks on classmates, Defendant Oswick issued a "Bully Investigation and Outcome Report" holding that the "The allegation of harassment or bullying on the basis of race (and disability and class) is founded." J. Roe Aff., Ex. N.

This finding was made in complete disregard of BVSD's written policies. BVSD's bullying policy explicitly defines "bullying" as actions with an "*intent* to coerce, intimidate or cause any physical, mental, or emotional harm to any student." (Emphasis added).  Attorney Miller Aff., Ex. F. Yet Defendant Oswick found James Doe responsible even though she did not find he *intended* to cause any harm, because the incident had a "significant impact" on the other students. J. Roe Aff., Ex. N. Defendant Oswick also disregarded BVSD's due process requirements for accusations of bullying. BVSD's policies require BVSD staff to "Meet with the alleged bully(s) individually," to "[i]nform them of the allegations," and to ask for "a detailed account of what happened; for names of witnesses; a response to the allegations (if appropriate); what outcome the student would like to see; if the student is in fear or apprehensive about attending school/class/activity…" Attorney Miller Aff., Ex. G. But Defendant Oswick provided no meeting to inform the Does of the allegations and provided them no meaningful opportunity to respond, as required by District Policy JDHB-E. *Id*.  She also bypassed the requirement to "investigate information from alleged victim(s) and alleged bully(s), including interviewing all relevant witnesses." *Id*.

The "outcome" of the bullying report was an ironically named a "support plan" for James Doe, since the plan harmed rather than supported him. In addition to requiring "[w]eekly counselor check-in and education session on discriminatory comment prevention," the plan banished James Doe to recess "at the alternate playground" from the other students used at the school, allowing him to bring only one friend with him. J. Roe Aff., Ex. Q. The plan also required James to change classrooms in the middle of his academic year, leaving his classroom teacher and moving to another fourth-grade class at the school. *Id.* As if the playground

ostracization and weekly counseling for a nine-year-old boy were not absurd enough, forcing James to switch classrooms in the middle of the year was disruptive to his education.

Moreover, Defendants' response to a Black student's allegation of "racist" verbal comments by a white student stood in stark contrast to their response to a white student's undisputed allegation of physical assault by a Black student. After choking James Doe, Sally Roe was not forced into social isolation at recess, moved to another classroom, or forced to meet weekly with a counselor — she was required to go to the office and write a reflection paper. A. Grandits Aff., ¶ 8.

### C.  Jamillah Richmond's public crusade against the Doe family.

Things only got worse from there. On January 22, 2023, Sally Roe's mother Jamillah Richmond, a BVSD employee and teacher at Whittier Elementary, blasted out a false and defamatory narrative about James Doe to her more than 2700 Facebook followers.  Attorney Miller Aff., Ex. A.  While she did not identify James by name in the post, it was common knowledge among Whittier Elementary parents that the post targeted James and his family. A. Grandits Aff., ¶ 29.

On Facebook, she wrote that "This singular child has said numerous racist and ableist comments to Black children for months. His parents are called each time (as is the standard operating procedure). His parents are the type of white people that go to DEI meetings and call themselves Democrats and allies. Nice white liberal racists who smile at you and go to meeting[s] but don't actually do anything tangible is who they are, their child is simply more honest…This boy knows exactly what he's saying and I'm disgusted with the lot of them." Attorney Miller Aff., Ex. A. This is false: As everyone at Whittier Elementary knew, including Ms. Richmond, James Doe had not made "numerous racist" comments, nor had the Does *ever*

been called about such an allegation prior to the playground game with Sally Roe. J. Roe Aff., ¶ 13.  Even if this had been true, such reports would be subject to BVSD's confidentiality requirements and FERPA, and thus would be confidential.

Unsurprisingly given the inflammatory nature of her post, a mob erupted among Ms. Richmond's followers alleging that James Doe should not be "in the presence of our kids to expose them to such ignorance." Attorney Miller Aff., Ex. A.  Some urged Ms. Richmond to make "their [the Does'] baby cry." *Id.*  Others stated that "[s]ome white people are just trash and make trash kids." *Id.* Yet others called for violence, expressing the hope that nine-year-old James Doe would be slapped, hit, or otherwise physically assaulted. *Id.*

But Ms. Richmond did not stop there in her crusade against a nine-year-old boy with whom she regularly interacts as a part of her job at Whittier Elementary. After James Doe was required to change classrooms as part of his "support plan," Ms. Richmond threatened to call and directly warn the parent of a Black child in James Doe's new class about James. A. Grandits Aff., ¶ 25. In response to Ms. Richmond's machinations, parents began calling the school counselor, Annie Dornbush, to express concerns about James. A. Grandits Aff., ¶¶ 30-31 .

James Doe's teacher was concerned that a district and school employee would publicly attack a nine-year-old student and his family, and so reported her concerns to Defendant Oswick. A. Grandits Aff., ¶32. Nothing came of this report. *Id.*, ¶ 33. Where James Doe's schoolyard comments were willfully misconstrued as somehow "racist" comments about Black Americans, Ms. Richmond's overtly racist statements and attacks against a helpless nine-year-old white child were ignored. Defendants' deliberate indifference to these attacks on a child in their care violate district policy. BVSD's social media policies for employees specify:

> [o]nline or electronic conduct resulting in a negative impact to the educational
> environment or other conduct in violation of District policy may form the basis for

8

disciplinary action, up to an including termination, and/or criminal or other legal action. Attorney Miller Aff., <u>Ex. H</u>.

Further, BVSD's "Suspension and Dismissal of Support Staff Members" policy states that an employee can be dismissed for "just cause," defined as:

(4) Discourteous, offensive, or abusive conduct or language towards other employees, students, or the public; (5) Unethical or obscene actions, gestures, or statements towards other employees, students, or any other person while on District property, during working hours, or at any time or place to the extent the conduct may adversely affect the operations of the District or the employee's fitness to perform his or her duties; (6) Dishonesty… Attorney Miller Aff., <u>Ex. I</u>.

District and school employee Jamillah Richmond's offensive and abusive posts, targeting a nine-year old-student and his family with racial stereotypes and insults, undeniably had a negative impact on the educational environment of James Doe. Yet BVSD took no action to protect James.

**D. Defendants refuse to address Jamillah Richmond's racist attacks on the Doe family.**

The Doe family has repeatedly requested that Defendants instruct Ms. Richmond to remove her social media post, but it remains up. Attorney Miller Aff., <u>Ex. J</u>; <u>Ex. A</u>; J. Roe Aff., <u>Ex. R</u>. The Does, through counsel, specifically asked for a formal no-contact order between Ms. Richmond and James Doe, but BVSD refused. Attorney Miller Aff., <u>Ex. J</u>. When investigating allegations of "racism" against James Doe based on a playground game, Defendants acted immediately. BVSD's "investigation" into James Doe's playground game and the subsequent false allegations against him lasted only a few days. False allegations were incorporated into the final report against James Doe in a matter of hours. This resulted in a playground banishment, a forced transfer to a separate class, a no contact order and, eventually, James Doe's constructive expulsion.  J. Roe Aff, <u>Ex. Q</u>. Yet BVSD took over a month to investigate Ms. Richmond's attacks on James and his family, only to conclude just yesterday that — unlike a nine-year-old's

innocent playground suggestion — Ms. Richmond's actions violated no district policies. J. Roe Aff., Ex. T.

As a results of Defendants' refusal to address the racially hostile environment created for a nine-year-old boy by one of their adult employees, James Doe has been unable to return to Whittier Elementary for more than a month. Defendants' actions have also made it difficult for James Doe to enroll elsewhere. Afraid to send him back to Whittier, the Does requested a copy of James's transcripts so that James could enroll in school elsewhere due to the unmitigated hostile environment at BVSD and Whittier Elementary School. J. Roe Aff., Ex. S. In response, Defendant Oswick refused to take even this small step to mitigate the harm caused to James and his family. Although the Doe family has a right to James's educational records under FERPA, Defendant Oswick refuses to send the transcript in a timely manner, and Whittier has notified the Does that the school will delay up to the maximum of 45 days to send the transcripts. *Id*. The only purpose that could possibly be served by this intentional delay to the routine provision of records is to further interfere with James Doe's education. Further, James Doe has a discipline record for harassment and bullying resulting from a discriminatory "Investigation and Bullying Report" that BVSD determined to be "founded." J. Roe Aff, Ex. N.

## II. ARGUMENT

### A. Legal standard for temporary restraining order and preliminary injunction.

In the Tenth Circuit, a movant seeking a preliminary injunction that would alter the status quo must demonstrate a "(1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would

not be adverse to the public interest." *SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). *See also O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (clarifying application of *SCFC* factors to injunctions that would alter the status quo).

The same standard that applies to a preliminary injunction also applies to a motion for temporary restraining order. *See Soskin v. Reinertson*, 260 F. Supp. 2d 1055, 1057 (D. Colo. 2003). Where, as here, John Doe can show irreparable harm and a likelihood of success on the merits, the Court should grant the TRO, pending a ruling on his motion for a PI.

**B. Plaintiffs have a substantial likelihood of success on the merits of their claims.**

*1) Defendants were deliberately indifferent to a racially hostile environment.*

There is a private right of action under Title VI for intentional discrimination. In the Tenth Circuit, a school's deliberate indifference to a racially hostile environment of which it is aware is a form of intentional discrimination. *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928 (10th Cir. 2003). Plaintiffs in *Bryant* alleged that school officials did nothing as white students came to school wearing Confederate flag t-shirts, used racial slurs, and carved epithets into school furniture. *Id.* at 932. This was sufficient to state a claim for intentional discrimination because, as in the instant case, "students and parents complained to the principal about the racist environment and the principal did not attempt to remedy the situation. The principal affirmatively chose to take no action." *Id.* at 932-933.

When evaluating a hostile environment claim under Title VI, the Tenth Circuit instructs the courts to apply the Supreme Court's "deliberate indifference" test set forth in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) (applying the analogous Title IX statute). *Bryant, supra.* A plaintiff must allege that the district:

(1) had actual knowledge of, and

(2) was deliberately indifferent to

(3) harassment that was so severe, pervasive and objectively offensive that it

(4) deprived the victim of access to the educational benefits or opportunities provided by the school.

*Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999).

Under *Murrell*, "the first two prongs of the *Davis* analysis require that a school official who possessed the requisite control over the situation had actual knowledge of, and was deliberately indifferent to, the alleged harassment." *Id.* at 1247. "Deliberate indifference in this context can also be phrased as an 'intentional choice to sit by and do nothing.'" *I.G. v. Jefferson Cty. Sch. Dist. through Bd. of Educ.*, 452 F. Supp. 3d 989, 1002 (D. Colo. 2020) (quoting *K.D. by Nipper v. Harrison Sch. Dist. Two*, No. 17-cv-2391-WJM-NRN, 2018 U.S. Dist. LEXIS 158512, at *6 (D. Colo. Sept. 18, 2018)).

As stated in *Bryant*:

> School administrators are not simply bystanders in the school. They are the leaders of the educational environment. They set the standard for behavior. They mete out discipline and consequences. They provide the system and rules by which students are expected to follow. … **[W]hen administrators who have a duty to provide a nondiscriminatory educational environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable**.

*Bryant*, 334 F.3d at 933 (emphasis added). Even where school employees and administrators may not "necessarily create the hostile environment … they might have facilitated the hostile environment or, in the least, permitted it to continue." *Id*.

The situation here is far worse than sitting by and doing nothing. Instead, Defendant Principal Sarah Oswick not only had "actual knowledge" of alleged harassment; she intervened to ratify and make it worse. Her disciplinary report expressly found that James had no racist

intent, which is a necessary element of discrimination at Whittier Elementary. Attorney Miller
Aff., Ex. F; J. Roe Aff., Ex. N. Yet, to placate his classmate's activist mother, Defendant Oswick
found James responsible anyway.  J. Roe Aff., Ex. N.

And the racial harassment did not come from another student — Sally Roe is equally
caught in the middle of this travesty. Rather, the hostile environment was created by a district
employee, Jamillah Richmond. Ms. Richmond has advocated for disparate punishment for
different children based on race, mostly in the form of lenience for students of color.  Attorney
Miller Aff., Ex. B. This most especially applies to her daughter. Attorney Miller Aff., Ex. E.
BVSD employee Jamillah Richmond justifies her daughter's assaults on her fellow students on
the basis of race because "[c]ulturally, if you touch our hair, we're slapping your hand, which is
exactly what my daughter does."  Attorney Miller Aff., Ex. B.

To Jamillah Richmond and the BVSD administrators she works for, lenience does not
apply to white children like James. Ms. Richmond immediately took to social media to smear not
only James but his entire family as "nice white liberal racists." Attorney Miller Aff., Ex. A.
BVSD and Whittier Elementary also had actual knowledge of its employee's attacks upon their
own student and his parents.  A. Grandits Aff., ¶¶ 28-32; J. Roe Aff., Ex. R.  Furthermore, for
Ms. Richmond, as a school employee, to disclose confidential student disciplinary information
publicly breached the confidentiality rights of the Does under FERPA.  *See, e.g., Gelfand v.
Cherry Creek Sch. Dist.*, No. 07-cv-01923-CMA-CBS, 2009 U.S. Dist. LEXIS 48931, at *30 (D.
Colo. June 10, 2009) (holding that "[p]rotecting Student's confidentiality was part of Plaintiff's
job and Plaintiff was subject to his employer's authority to restrict speech related to confidential
student information").

James's teacher at Whittier Elementary repeatedly brought Ms. Richmond's Facebook posts to Defendant Oswick's attention. A. Grandits Aff., ¶¶28-38. Meanwhile, Ms. Richmond continued her campaign by warning parents in James Doe's new class about a supposed racist in their midst, something Defendant Oswick was also perfectly aware of. A. Grandits Aff., ¶ 31. As Principal, Defendant Oswick is clearly "a school official who possessed the requisite control over the situation" to end the harassment of James Doe. See *Murrell*, 186 F.3d at 1246.

It is also clear that Defendants were deliberately indifferent to the racial harassment of James Doe. Defendant Oswick did nothing in response to complaints of the Doe family and of James's teacher at Whittier Elementary. Perhaps fearing accusations of racism from her activist employee Jamillah Richmond, Defendant Oswick not only sat idly by as an adult woman smeared an innocent nine-year-old boy — she also made the situation worse.

James Doe's teacher reported her concerns about Jamillah Richmond's social media campaign to Defendant Oswick. A. Grandits Aff., ¶¶ 32, 35-37. In response, not only did Defendant Oswick take no action to protect James; she made James Doe's teacher feel that *she* had done something wrong in reporting the bullying of James Doe by a district employee. Id., ¶ 33.

In a January 27, 2023, email to Defendant Oswick, James's mother Jane Doe directed Defendant Oswick to Jamillah Richmond's social media thread about James, and expressed concerns about James's safety and Ms. Richmond's access to him while at school. J. Roe Aff., Ex. R. Ms. Richmond not only works in the Whittier library, where she had access to James Doe every week, but she also serves as a substitute teacher in James Doe's class. A. Grandits Aff., ¶ 9. Jane and John Doe met with Defendant Oswick on January 25, 2023, and then followed up by email again that evening to express continued concern about James's safety at school. J. Roe Aff.,

Ex. R.. Defendant Oswick took no action to shield James from Ms. Richmond or to address Ms. Richmond's racialized attacks on James. *Id*.

Meanwhile, James Doe's teacher submitted a second report about Ms. Richmond's post through the district's "Safe to Tell" reporting system. A. Grandits Aff., ¶ 35. Doe's teacher hoped that someone else in the district might act where Defendant Oswick had not. *Id*. But as it turns out, that report was also obstructed by Defendant Oswick, who again did nothing except to instruct Doe's teacher not to say anything to anyone about her concerns over the bullying of James Doe. A. Grandits Aff., ¶ 40.

Defendants' actions have deprived James of access to Whittier Elementary's educational benefits and opportunities, to which the Colorado grants him a constitutional right. See *Taxpayers for Pub. Educ. v. Douglas Cty. Sch. Dist*., 2015 CO 50, ¶ 19, 351 P.3d 461, 468 (noting "constitutional provision guarantees that 'all [school-age] residents of the state . . . may be educated gratuitously.'") (quoting Colo. Const. art. IX, § 2) (vacated and remanded on other grounds, __ U.S. __, 137 S. Ct. 2327, 198 L. Ed. 2d 753 (2017)); *Lobato v. State*, 2013 CO 30, ¶ 50, 304 P.3d 1132, 1144 ( "Since statehood, the Colorado Constitution has required the General Assembly to "provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state … Then, as now, this affirmative constitutional right to public education in Colorado is of paramount importance ... 'It is the very foundation of good citizenship'" (quoting Colo. Const. art. IX, § 2 and *Brown v. Bd. of Educ*., 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873 (1954)).

Indeed, the deprivation of access for James has been total. The nine-year-old fourth grader has not been to Whittier Elementary in a month because his parents do not feel he can safely attend school while a district employee's Facebook post smearing him and his family as

racist remains online and publicly accessible, and while students and parents continue to labor under the belief — widely disseminated by Jamillah Richmond — that he is an evil racist.

Finally, Ms. Richmond's conduct is severe, pervasive, and objectively offensive. Of particular relevance to this inquiry are James Doe's young age and the relationship between James Doe and Jamillah Richmond, a district employee who regularly interacted with James in the school setting. In *Davis*, the Supreme Court held that whether conduct rises to the level of creating a hostile environment depends on a "a constellation" of factors, including "the ages of the harasser and the victim." *Davis*, 526 U.S. at 651. The *Davis* court also noted the importance of the "relationship between the harasser and victim," stating that "teacher-student harassment" is more likely than peer harassment to breach the "guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." *Id*. at 653.

Here, Ms. Richmond targeted a nine-year-old child, enrolled in the school where she works, for online harassment. She publicly claimed that it was "gross negligence" for James to be "allowed to be in the presence of our kids to expose them to such ignorance." Attorney Miller Aff., Ex. A. She claimed, in contradiction of the school's finding that James did not intend to harm anyone with his playground game, that James "knows exactly what he's saying" and is simply more "honest" than his parents, whom she called "nice white liberal racists." *Id*. She suggested the Does should be sued because it was "child abuse" to "raise these types of humans" — that is, humans like nine-year-old James. *Id*. In response, her followers added to the pile-on, calling James an "evil child" and noting that "some white people are just trash and make trash kids." *Id*. When one commenter suggested that she could think of comebacks "that leave them in salty tears," another replied that "I love yt [white] tears lol." *Id*. Further, after successfully getting James removed from her daughter's fourth-grade classroom, Ms. Richmond attempted to

ensure James's social isolation by warning parents in his *new* classroom about him — leading to calls and other communications from parents concerned about their children interacting with James. A. Grandits Aff., ¶¶ 25, 30-31.

2) *Defendants' discriminated against James Doe by selective enforcement of their disciplinary policies.*

Whittier and BVSD also discriminated and continue to discriminate against James Roe by selectively enforcing their policies on the basis of race.

Selective enforcement claims draw on "ordinary equal protection standards" that courts firmly established in American law at least since 1905. *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (citing since *Ah Sin v. Wittman*, 198 U.S. 500 (1905)). The principle is simple and intuitive. A school, like Whittier, discriminates by treating students of one race differently from students of another race, even though Whittier is legally obligated to apply its policies equally to all races. To establish discrimination in regimes of race-based selective-enforcement, a plaintiff "must produce 'some evidence' of both discriminatory effect and discriminatory intent." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (addressing selective enforcement of traffic stops on the basis of race) (quoting *Armstrong*, 517 U.S. at 470). "[T]he claimant must show that similarly-situated individuals of a different race were not prosecuted." *Id.* In addition, a plaintiff must show "that discriminatory intent was a 'motivating factor in the decision.'" *Id.* (quoting *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003)).[1] "Discriminatory intent can be shown by either direct or circumstantial evidence." *Id.*, (citing *United States v. Deberry*, 430 F.3d 1294, 1299 (10th Cir. 2005)).

---

[1] Selective enforcement differs from a "disparate impact" claim, which permits an inference of racially discriminatory impact without proof of intent. *Id.* at 1191; Bryant, 334 F.3d at 931-32. Disparate impact claims are not allowed under Title VI because Title VI requires evidence of intent to discriminate. *K.D. v. Harrison Sch. Dist. Two*, No. 17-cv-2391-WJM-NRN, 2020 U.S. Dist. LEXIS 66245, at *22 (D. Colo. Apr. 15, 2020) (citing *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).

Defendants' selective enforcement is obvious here. James Doe, a white student, was severely punished for inferences of racism after a playground game suggesting "bodygaurds and servants." His accuser Sally Roe, a Black student, was required to do nothing more than write "reflection papers" after physically assaulting James and other children. The choice to mete out such radically different punishments is evidence of Defendants' discriminatory intent, because "[c]hoice implicates intent." *Bryant*, 334 F.3d at 933.

Defendant Oswick accepted all of Sally Roe's allegations as true, and without any semblance of investigation, permanently branded James Doe as a racial harasser despite expressly finding no discriminatory intent in suggesting a harmless playground game. Then BVSD punished James Doe as harshly as possible while permitting its employee, Jamillah Richmond, to publicly shame and defame the Does on social media.

By contrast, multiple complaints of similar and worse behavior by white students about Sally Roe were treated with leniency. Teachers who complained were muzzled. They obviously did not take to social media to deride Roe or her mother's "Blackness" — nor would they. Racism is only acceptable at BVSD only when directed at white children.

While Whittier appeased Jamillah Richmond and coddled Sally Roe, who got to draft "reflection papers" even after choking James Roe to the point he was sent to the nurse's office; Whittier made James Doe a pariah. James Doe has been constructively expelled without due process. Ms. Richmond publicly celebrates her daughter's assaults on fellow Whittier students as "anti-racism." To be clear, the Does do not claim that the Black child, Sally Roe, should be punished more harshly; two miscarriages of justice against defenseless 9-year-olds cannot create "equity" and certainly cannot create equality before the law. The Does, as do most Americans, abhor racism in all its forms and have joined in calls for "restorative" discipline. J. Roe Aff., ¶

24. The family, ironically, sought out Whittier for its diverse, mixed-race population.  J. Roe Aff., ¶ 3.  But what the Does cannot be allowed to suffer is Defendants' arbitrary punishment/protection of students on the basis of race.

Furthermore, there is direct evidence of BVSD's racist intentions.  Its selective enforcement has coincided with overtly racist statements of policy, not only by would-be "activist" employee Ms. Richmond, but also by BVSD's Superintendent.  Before driving James Doe from school, BVSD publicly announced its implementation so-called "culturally responsive" discipline policies.[2]  BVSD's Superintendent also instructed white parents that part of being "anti-racist" meant "showing a willingness to feel discomfort." *Id.* BVSD then imposed this "discomfort" on James Doe and his family.

As a result, Defendants have selectively enforced their policies against students who are near exact comparators and are liable under Title VI.

*3) Sally Roe and James Doe are comparators*

James Doe must show that Defendants discriminated against him compared to similarly situated comparators. Sally Roe and James Doe are similarly situated comparators.

In claims of selective prosecution, when plaintiffs dispute the discretion of law enforcement, the standard for comparators is "demanding." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006); see also *MacKey v. Hilkey*, No. 21-cv-01226-WJM-NRN, 2021 U.S. Dist. LEXIS 257104, at *19 (D. Colo. Dec. 10, 2021) (discussing strict "class of one" standard for comparators applied to plaintiff challenging denial of parole on equal protection grounds).

---

[2] Letter from Superintendent Anderson, "Standing together against racism and injustice," June 3, 2020, https://www.bvsd.org/about/news/news-article/~board/district-news/post/standing-together-against-racism-and-injustice (linking to information on district's "culturally response" discipline practices).

But less strict standards apply to "case[s] of student-on-student harassment, [where] case law has not required a direct comparator."  *Tucker v. Univ. of N.M. Bd.*, No. 1:21-cv-00736-SCY-JFR, 2022 U.S. Dist. LEXIS 136940, at *38-39 (D.N.M. Aug. 2, 2022) (citing *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1283 (10th Cir. 2017)) (establishing comparators in analogous Title IX case).[3]

For example, in *A.C. v. Jefferson Cty. R-1 Sch. Dist.*, No. 20-cv-00078-CMA-SKC, 2021 U.S. Dist. LEXIS 185181, at *9 (D. Colo. Sep. 28, 2021), a Magistrate Judge had applied the strict "class-of-one" standard in a student-on-student harassment case and recommended dismissal of a female student's gender-discrimination equal protection claim because boys could not be compared to girls. See *A.C. v. Jefferson Cty. R1 Sch. Dist.*, at *15-*16.  There, as here, at issue were students involved in the same disciplinary issues, in the same school, subject to the same administrative supervisors.  *Id*.  The District Judge disagreed and reversed the Report and Recommendation in relevant part. Although the class-of-one standard requires that "'[i]ndividuals are similarly situated only if they are alike in all relevant respects'"; the Court found that the Magistrate Judge had parsed too finely. *Id*. at *9 (quoting *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018)).  The pleadings indicated the school had favored the male students over the female student by doing exactly what Whittier has done to James Doe here (albeit on the basis of race) in the midst of the same disciplinary incidents:

---

3 Title IX and Title VI are generally interpreted in the same way. *See, e.g., Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) (noting "Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa)"); *Clark v. Newman Univ., Inc*., No. 19-1033-KHV, 2022 U.S. Dist. LEXIS 164360, at *33 (D. Kan. Sep. 12, 2022) (collecting cases for holding "Title IX is interpreted consistently with Title VI"); *see also McDaniel v. Dominium Mgmt. Servs., LLC,* No. 21-cv-01997-RMR-NYW, 2022 U.S. Dist. LEXIS 80208, at *32-33 (D. Colo. May 3, 2022) (same).

- "the school pulled [the girl] from her classes ...";

- the school "allowed the boys to remain in those classes…";

- The school "prevented [the girl] from taking those classes, thereby depriving her of educational opportunities and placing her in lower performing classes";

*Id.* at *11.

But whichever standard this Court applies — the "class of one" standard or, more appropriately, a more relaxed standard for student-on-student harassment — Sally Roe and James Doe are near exact comparators:

- Both students attended the same school.

- Both students are fourth-graders.

- Both students are subject to the same policies covering bullying and discrimination.

- Both students are supervised by the same BVSD administrators.

- James Doe alleges that Sally Roe targeted him on the basis of race to escape consequences for her violent assaults against him and multiple other children; and

- Sally Roe alleged that James Doe targeted her on the basis of race by suggesting a playground role-playing game.

The only material difference is that Sally Roe is Black and James Doe is white—thus isolating the protected characteristic demonstrating Defendants' illegal discrimination. The fact that either pre-adolescent child is female or male is immaterial. They are direct comparators.

**C. James Doe will suffer irreparable harm without an injunction.**

To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *See Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016). Further, "[t]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005).

Here, James Doe has not been back to Whittier Elementary for more than a month because Defendants refuse to address the racially hostile environment he faces there. Meanwhile, his ability to attend another institution remains uncertain both because of the district's refusal to issue his transcripts, and because of the damaging finding of racial bullying that is a part of his educational record. Just this week, James began attending a local private institution — one that would provisionally accept him without a transcript or educational record — on a temporary basis. It is unclear, however, whether this institution will allow James to continue there on a permanent basis once they receive his educational record from BVSD, which includes the wrongly imposed finding that he engaged in racial bullying. Nine-year-old James remains in educational and emotional limbo, struggling to adjust to a completely new environment while also knowing he may need to leave there as well. The immediate risk to James's educational prospects and emotional well-being is further exacerbated by the continued availability of Jamillah Richmond's Facebook post smearing James and his family as racists.

The Does therefore satisfy the irreparable harm prong of this court's inquiry.

### D. Defendants Suffer No Harm if the TRO/PI Is Granted and the Public Interest Favors the Does' Motion

"In balancing harms, a court looks at whether the moving party's 'threatened injury outweighs the injury the opposing party will suffer under the injunction.'" *Core Progression Franchise LLC v. O'Hare*, 2022 U.S. App. LEXIS 14845, *9 (10th Cir. 2022) (internal citations omitted). While James's ability to obtain an education will be irreparably harmed absent an injunction, Defendants' ability to educate the students of Boulder Valley School District will not be harmed at all by the issuance of an injunction. The remedies requested are targeted, narrow, and impose no burden on Defendants other than perhaps incurring the anger of their activist employee.

The public interest also favors granting a TRO/PI. The public has a strong interest in preventing racial discrimination and harassment in public education. Indeed, the existence of Title VI and comparable state anti-discrimination laws reflect the government's strong interest in preventing discrimination on the basis of race. *See, e.g.*, *Ireland v. Kansas Dist. of the Wesleyan Church*, 1994 U.S. Dist. LEXIS 11367, *14 (D. Kan. 1994) (holding, in request for injunctive relief in disability discrimination case, that "[t]he Rehabilitation Act reflects Congress's recognition that there is a significant public interest in eliminating discrimination against individuals with disabilities.")

### III. CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and enter a Temporary Restraining Order requiring

1) Defendants to immediately release James Doe's transcript;

2) Remove any mention of the bullying investigation and outcome from his educational record pending final disposition of this lawsuit;

3) Order Defendants to direct their employee Jamillah Richmond to remove any and all Facebook posts targeting James Doe pending resolution of this lawsuit;

4) Order Defendants to impose a No Contact Order forbidding contact between Defendant's employee Jamillah Richards and James Doe, Jane Doe, and John Doe; and

5) Order a full hearing on Plaintiffs' Motion for Preliminary Injunction to take place at time and place that pleases the Court.

Respectfully submitted,

Michael Thad Allen
Samantha K. Harris
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06375
TEL: (610) 634-8258
mallen@allenharrislaw.com
sharris@allenharrislaw.com

for PLAINTIFFS

## CERTIFICATE OF SERVICE

At the time of filing of this motion, I certify that copies of all pleadings, documents, and exhibits filed in this action to date or to be presented to the Court at the hearing have been provided to opposing counsel and any unrepresented adverse party.  At the time of filing, I emailed a copy of all the above-mentioned papers to

Kathleen Sullivan kathleen.sullivan@bvsd.org and
Kara Phillips kara.phillips@bvsd.org,

who have corresponded with attorneys of Allen Harris PLLC as counsel to Defendants.  The documents provided included:
1) The Complaint
2) Summons
3) Waiver of Service Forms for All Defendants
4) Affidavit of Attorney Kellie Miller with Exhibits A-L
5) Affidavit of Jane Doe with Exhibits N- T
6) Affidavit of Anne Grandit
7) Motion for Temporary Restraining Order and Preliminary Injunction
8) Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction
9) Motion for Restriction
10) Memorandum of Law in Support of Motion for Restriction

Michael Thad Allen, Esq.